S. C., Hay., 305, 316.
General Winchester exhibited his bill in equity against John B. Evans and others, in *Page 421 
the lifetime of Evans, setting forth that previous to the year one thousand seven Hundred and ninety-four, he, for the firm of James and George Winchester, had dealings with and had purchased from the firm of Jackson and Evans, merchants, then residents of the city of Philadelphia, to a considerable amount; that in the month of December, 1793, he went to Philadelphia and paid unto Jackson and Evans the full amount that was owing them, and took a receipt in full of all demands up to the first day of January, 1794; that, after he had discharged the demand, he told Jackson and Evans that he had a quantity of certificates for the pay of men who had performed militia service in the Territory of the United States, southwest of the river Ohio, which certificates he would give them for goods. That a certain David Allison, then in Philadelphia, had been appointed paymaster by the United States of those claim's, and that he acted as such at Knoxville, where the claim's were to be paid. The complainant further states that he recollects to have conversed with Jackson and Evans respecting the nature of these claims; and that they particularly knew the degrees of responsibility between persons paying and persons receiving such certificates, which were that the receiver took the certificates, having a power annexed with a blank, which, being filled up, entitles the receiver or his agent to draw the amount from the War Department or the paymaster at Knoxville. And that, if owing to any defect in the certificate or power of attorney the pay could not be drawn by the merchant or receiver, the person of whom he got it should be accountable; but, if recovered of the government, the person paying the certificate should be forever discharged.
The bill further charged that, upon the proposition so by him made to give certificates for goods, Jackson and Evans told him, if he would get Allison to examine the certificates and he would report them to be good, they would take them; and that he was then directed to let Allison examine *Page 422 
them, and if he thought they were good to leave them with Allison and apply for the goods; that Allison did examine them and found them to be good, valid and authentic, whereupon they were left with him agreeably to the directions of Jackson and Evans; that Allison then wrote to them, informing them that he had received from the complainant $5,846 in militia claims, which letter Jackson and Evans kept as a voucher against Allison; and that the complainant thereupon took up goods to the aforesaid amount. That, at the time these transactions happened, Allison acted as the agent of Jackson and Evans, and that, at a subsequent period, he paid over to them the greater part of the amount of said certificates, the whole having been received from government, and would have paid the balance had it not been that they were indebted to him to a greater amount than he retained. That in the year 1797, the complainant being then in Philadelphia, he was arrested at the suit of Jackson and Evans for the amount of the goods, but, upon his being brought before the Chief Justice, he was discharged without giving special bail; and that upon such examination Allison was produced as a witness, who swore the matters were true, as herein before set forth, and also produced an account current signed by Jackson and Evans, wherein he was charged with $5,846, the precise mount received by him in certificates from the complainant, and which account current left a balance due Allison from Jackson and Evans, of several thousand dollars.
The bill further charges that, notwithstanding these circumstances, Jackson and Evans proceeded on with the suit and recovered a judgment for the amount of the claim; that at the trial, which was in the year 1800, the Court refused to permit the reception of evidence to prove what had been sworn to on the examination before the Chief Justice by Allison, although he was then dead; that the complainant, who lived 900 miles from Philadelphia, had always relied upon the benefit of Allison's testimony; *Page 423 
and that he did not know of his death until after the trial, otherwise he could have supplied the defect by other evidence; that he had not procured the other evidence, because the witnesses were at a distance, and Allison lived in Philadelphia where he could always be had; and that upon the death of Allison the account current could not be found, in consequence of the deranged situation of his papers. That after the recovery of the judgment, Jackson, who is made a defendant, removed to this State and had settled in the county of Davidson, but that Evans still lived in Philadelphia.
The prayer of the bill was for relief against the judgment recovered in Pennsylvania.
After the death of Evans the suit was revived in the name of Anne B. Evans and Henry Hawkins, his administrators, who thereupon appeared and pleaded that Evans and Jackson "did, on the 29th day of December, 1796, commence an action against James Winchester in the Supreme Court of Pennsylvania, by writ of capias ad respondendnm, whereupon the said James being arrested, appeared and pleaded to the said action; and thereupon, after various continuances it was so proceeded, that on the 20th day of March, 1800, verdict of twelve honest and lawful men of the county of Philadelphia, on a full trial of the merits of the controversy under the plea of the general issue, was given in favor of the said defendants, and damages were assessed at seven thousand nine hundred and five dollars, with six cents costs. And thereupon, by the said Supreme Court it was considered that the said Samuel and John should recover of the said James the said sum of seven thousand nine hundred and five dollars, with six cents costs, which judgment remains in full force and unsatisfied, as by the record of the same plea and judgment here now to the Court shown more fully appears.
And they do further aver, that the allegation contained in the complainant's bill, with respect to the trial therein referred to in the Supreme Court of Pennsylvania in the action which was there pending *Page 424 
between Jackson and Evans, plaintiffs, and the said James, defendant, and the assertions that he was surprised thereby, and had not a fair opportunity of defence, are altogether unfounded. And these defendants further say that the Supreme Court of Pennsylvania have equitable as well as legal powers, and in the trial of causes, the parties in any case where they would be entitled to relief in a court of chancery, if such a court existed in Pennsylvania, would be entitled to, and receive the same relief from, a jury under the direction of the Court. And that the judgments and decisions of the said Supreme Court of Pennsylvania are final and conclusive by the laws of that State, until they are reversed for error appearing on the face of the record. And, therefore, these defendants do plead the said verdict and judgment in bar of the said bill; and humbly pray the judgment of this honorable Court whether they shall be compelled to make any further answer thereunto."
Samuel Jackson, the other defendant, filed a similar plea; and both the pleas were accompanied by answers. The answers were replied to, but the pleas were set down for argument.
The only question which arose upon the argument of the pleas, was whether the judgment of a sister State is to be received as conclusive or only prima facie evidence.
Haywood and Cooke, for the complainant. The question to be settled in consequence of the plea which has been filed by the defendants, is one of considerable importance, not only as it relates to the case before the Court, but also as it regards the establishment of a principle of great consequence to the community at large. The courts of several of our sister States have had this matter under judicial consideration, and very different results have been produced. Authority, therefore, can avail but very little in this case; and we shall consequently be constrained, in order to arrive at a correct determination, to rely almost entirely upon *Page 425 
our own ideas of a correct construction of the Constitution and the act of Congress.
The Constitution of the United States, in Art 4, sec. 1, declares that "Full faith and credit shall be given in each State, to the public acts, records and judicial proceedings of every other State. And the Congress may, by general laws, prescribe the manner in which such acts, records and proceedings shall be proved, and the effect thereof."
Pursuant to this article of the Constitution, Congress passed an Act declaring the mode in which the acts, records, and judicial proceedings in each State should be authenticated. It is then enacted, that such acts, records, c., so authenticated, "shall have such faith and credit given to them in every court within the United States, as they have by law or usage in the courts of the State from which they are or shall be taken."
From this statute the counsel for the defendant contend, that inasmuch as the judgment now under consideration could not be inquired into in the State of Pennsylvania, so neither can it here. This argument is predicated upon the fact, that in that State there is no court of equity; because, even admitting the construction which is put upon the act of Congress, and which we shall presently notice, it is certainly unquestionable that a court of equity in one State, whose judicial functions are called into exercise to enforce the judgments of another State, may inquire into the equity of the demand, provided a tribunal exists in the State where the judgment was rendered possessing such superintending control.
Were it not for the last clause in the article of the Constitution referred to, which provides that Congress shall have power to declare the effect of the judgment, it is very possible that this question would be with the defendants. Full faith and credit, abstractly considered, may imply absolute verity in every particular; but however this may be, it is most obvious to us that the framers of the Constitution, in using these expressions meant only *Page 426 
to make these records, c., incontrovertible evidence of everything that appeared in them, viz., that the judgment was recovered, by and against the parties named, for the sum, and for the cause of action expressed in the manner stated, c., but not that they should, in all cases, he received as conclusive evidence of the justice of the judgment. The full faith and credit spoken of both in the Constitution and the act of Congress, means simply that the record shall be received as conclusive evidence that all the facts which it contains are true; but not that the recovery was just, — of that it can be no more than prima facie evidence. If this course of reasoning is erroneous, the clause in the Constitution authorizing Congress to declare the effect of the judgment, is totally absurd and unmeaning; and no rule is better established than that all laws shall be so construed, if practicable, as to give effect and meaning to every part. This is done if the construction which we put upon the Constitution prevails.
It follows, therefore, that the Constitution only declares the faith and credit of the judicial proceedings of each State in every other, but that the effect of these proceedings is left to be declared by Congress. This has never been done. The mode of authenticating records for the sake of producing uniformity in such matters, has been prescribed by Congress; but nothing further is said in the Act, except a substantial repetition of the Constitution upon the subject of faith and credit. From the most impartial and candid view which we are capable of taking of this subject, this conclusion inevitably impresses itself upon us, that a record of a judicial proceeding of another State, when attempted to be enforced here, is, as to its effect, to be received as prima facie evidence only. 1 New York T. R. 460; 1 Dal. 188, 261; 1 Mass. T. R. 401; and the opinion of Chief Justice Marshall, delivered in the Federal Circuit Court for the district of North Carolina, and reported in the North Carolina Law Repository. *Page 427 
A very strong additional argument is derived from the old articles of confederation. By the 4th article it was expressly provided that "full faith and credit shall be given in each of these States to the records, acts and judicial proceedings of the courts and magistrates of every other State." This clause in the Articles of Confederation goes fully as far as either the Constitution or the act of Congress; but we believe it was not then conceived that full faith and credit meant anything, except an allusion to the record as a matter of evidence. Indeed, when the construction now contended for was then urged the courts met it and put it down without hesitation or difficulty and declared that, if the record was to be received as conclusive evidence of the justice of the demand, an execution might as well issue at once. 1 Dal. 188, 261. And, indeed, it does seem most demonstrably absurd to call upon the defendant to show cause why there shall not be a judgment entered up against him, when, if he comes into court to do so he is told that he can make no defence. Such a proceeding would frequently make our judicial department a vehicle of injustice and oppression. 5 Johns. 37, 132.
The principal case which has and will be relied on by the counsel for the defendants, is that of Armstrong v. Carson's Executors, 2 Dal. 302. It is a very short case, in which the judge, the point having been previously surrendered by the defendant's counsel, decided that nil debet
could not be pleaded to an action of debt brought in Pennsylvania upon a judgment recovered in New Jersey. Mr. Justice Wilson, who gave the opinion, does not go into any reasoning upon the subject; and however highly we may appreciate his claim to legal talents, we can not subscribe to an opinion evidently formed upon the spur of the occasion, and that, too, without argument or any apparent; examination.
Other cases are relied upon as having been decided in Connecticut and Kentucky. Kirb. Rep. 119; *Page 428 
Hardin's Rep. 413. Both these adjudications we consider are in our favor, so far as they relate to any matter in conflict before the courts where they took place. We are not disposed to say much about those cases, but the view taken by the Court, in the case reported by Hardin, we think deserves some little examination. That was a case where a judgment had been recovered in Virginia by a proceeding in rem, which was attempted to be enforced in Kentucky. The defendant filed a plea contesting the original right to recover, and did the Court overrule the plea? No; the plea was admitted. It is true the Court attempted to draw a distinction between that case and one where a judgment had been recovered by personal service of process; but to any man who examines the subject with a view to a true determination under the Constitution and the act of Congress, this distinction will seem palpably fallacious. A proceeding in rem is as much a judicial proceeding as a proceeding in personam. The record in both cases is entitled to full faith and credit; but in neither is it to be received as conclusive evidence of the justice of the recovery.
Whiteside and Hayes, argued very fully for the defendants.
The questions which have been discussed, are produced by the plea of the defendants. Suppose the plea to be true, can the matter in dispute be re-examined in this Court?
It is said it can not, because the matter has been adjudicated in the State of Pennsylvania; and that the Constitution of the United States and the act of Congress passed in pursuance thereof, precludes all examinations into the merits of that judgment in this State.
Upon this general question the opinions of legal characters in the United States have been very *Page 429 
much divided. So much has been said upon the subject that, at the present day, a man may with more propriety be said to adopt the opinion of another than to form one for himself. The opinion to which I at present incline is that the record is not conclusive evidence that the decision was undeniably right. When a record is authenticated in the manner prescribed by the act of Congress. I hold myself bound to receive it as evidence — I hold myself bound to receive it as conclusive evidence that such a judgment was rendered as that record speaks of; but I do not hold myself precluded from inquiring into the grounds upon which that judgment was rendered. And if the defendant can clearly show, upon the merits, that such a judgment, when the whole truth is known, ought never to have been pronounced, I would consider myself at liberty to grant him relief.
I doubt whether the Constitution ever intended to vest Congress with a power to determine what effect the judgment should have in the State to which it is sent. It seems to me probable it intended that Congress should have the power to point out the effect of the authentication which they might prescribe. Because, in the preceding sentence it is said, "full faith and credit shall be given to the public acts, records and judicial proceedings of other States, — Congress may prescribe the mode of proof and effect thereof." If Congress have the power of declaring the effect of the judgment, why not the power of declaring the effect of a legislative Act? Would not this have been a most dangerous power to vest in Congress? I can hardly believe that the framers of the Constitution intended to vest it. But there would be much reason to vest Congress with a power of prescribing the mode of authenticating these documents and declaring the effect of the authentication when made. The mode would then be uniform throughout the States, and the courts of each would be compelled to receive the record as evidence that such a judgment was in fact rendered; and still, upon general *Page 430 
principles, the defendant be left at liberty to inquire into the subject-matter of that judgment, and, if he could satisfy the Court that no such judgment ought to have been given, the Court could refuse with propriety to give it any effect to the prejudice of the defendant. 1 Doug. 1; 1 Dal. 188, 261; Con. U. S. sec. 1, Art. 4; 1 Laws U. S. 115; 1 Johns. Rep. 37, 132; 1 Mass. T. R. 401; Kirby, 119; Hardin, 413; Penn. Rep. 400; 2 Caine's C. E. 48; 2 Dal. 302; 1 Dal. 229, 291; 1 Day, 168; 5 East, 473; Addison, 266; North Carolina Law Rep., 77.
Again, it has been insisted that this plea is good, even though the record is only prima facie evidence, that it shows there was a full and fair trial at law, and that a court of chancery can not interfere.
In this case I view the answer of the defendants as intended only to aid the plea, — the two as constituting one entire defence; and, therefore, that the answer does not overrule the plea. Mit. 204, 205.
And upon this last point I think with the defendant's counsel that, taking the matter of the plea to be true, it would bar an investigation in this Court. 3 Atk. 223; 1 Johns. C. E. 491; Mit. 204, 205; 1 Johns. C. E. 436; 4 Hen. Mun. 455. If the complainant chooses to deny the truth of this plea lie can still reply to it, as well as to the answer; and he may then have an opportunity of showing that there was not a full and fair trial, and that, therefore, the judgment ought in equity to have no effect. But while ever I am constrained to believe that there was a full and fair trial in a court of law, it will be an objection with me to a reinvestigation in a court of equity.
The plea is, therefore, allowed to be good on this latter point.